You look just like the person who argued the case. Quite the resemblance. Go ahead. Thank you. It may please the Court. I'd like to just pick up where we just were. Maybe not quite where we just were, but on the test procedures, I think I can maybe shed some additional light on how that works in the context of a zero standard. I don't think you apply the test procedures at the place where a consumer is using the appliance. That's not what the statute says, and I don't think that's what the Ninth Circuit is saying. You apply the test procedures as regulated, and so those test procedures for a gas appliance are going to involve actually turning the appliance on, having a gas supply. I can't say I've read the regulation explaining how to do it technically, but I am sure that it involves actually operating the appliance. That's going to generate a number that is the appliance's energy use, and under the federal standards, what you would do is you compare that number that results from the test procedures to the federal standard. If it meets the federal standard or exceeds the federal standard, the appliance can be sold. You stick the number on the label. Do the same thing here, but whenever that number exceeds zero, you can't have it in a new building in New York City. So I remember listening to the Ninth Circuit argument that you had a colloquy with some of the judges there over supply versus demand regulation. Is that an appropriate way to think about it? I think — I'm not sure that supply versus demand is the best way to frame it. I think, you know — because distribution, for example, can somehow be set to supply. So I think you should take the definition of energy use and, you know, apply regulation concerning the energy use, and, you know, to the extent that supply versus demand is like the cases like Rowe, for example, or engine manufacturers where you're just switching the regulation from the supply side to the demand side. That is — I don't think that kind of change would make another — would evade preemption. And I think that's what those cases stand for, but I think they also stand for the broader principle that you can't do indirectly what you can't do directly. And I think that's the case the panel ultimately took away from it. I'm sorry for forgetting the exact context of that question. No, no, no, no. Don't be sorry. This is a hard case, and it was a different — it was before a different court. I think — I'd like to just briefly touch on the one issue that is a little different in the State case, which is the Secretary's argument about the facial challenge standard. There are two reasons the Secretary is wrong. The first is that the Secretary is misapplying the standard. What — the Secretary's argument confuses the scope of New York's statute with the scope of the plaintiff's challenge here. And the Supreme Court said in Doe v. Reed that what matters is the universe of the challenged applications. That's what you apply the facial challenge standard to. And here, our challenge goes to the statute's effect on covered products. We're not challenging the statute's effect on non-covered products. So the fact that our — that's not preempted because Congress chose in 6297C to tailor preemption and the effect of preemption to covered products isn't a problem from a facial challenge standpoint. And second, in any event, at the end of the day, it's a concern about our pleading and whether the complaint was written too broadly in places. I don't think that's a problem with the complaint. But at best, what the Secretary has identified is a technical defect that could have been fixed by amending the complaint and that has no bearing on the legal issue that's before this Court. We could write the complaint in the way the Secretary wants it to be written to more clearly identify, if it's not already clear, that all we're challenging is the statute as it's applied to covered appliances, and we'd be right back here with exactly the same legal dispute. So one of the things that I'm interested in is you answered the question to Judge Sachs that you thought both of these cases needed to go in the same direction. Do you — one of the differences, I think, between the regulation and the statute that we're dealing with is the exceptions in Local Law 154. Can you explain to me why that doesn't make the State case any different? I think both the — both the State and the City have some types of buildings for which there aren't — for which there are exceptions, rather. And the fact that they're not going as far as they could into the preempted territory doesn't cure preemption. So I think the building code except — The more what I'm wondering, though, is does the exceptions make it more like a — like a typical zoning requirement for one that doesn't — I mean, to me, the degree is not going to — I think you're — I personally think that you're correct about the degree does not change the preemption calculus, but does it change what the regulation is by making one more akin to a zoning requirement than an energy conservation standard? I don't think the City's exceptions do that. You know, we're certainly not saying the zoning requirements are preempted. For the — some of the examples in the district — I guess both zoning and kind of installation-style requirements. Like, there's a requirement that you can't put a gas water heater in a bedroom. We're not saying that that's preempted. Those go to, you know, how exactly do you go about installing the appliance safely? But they don't actually prevent consumers across the board from using the appliance in the way that an energy conservation standard does. Okay, but then that's — then that becomes, again, a line drawing. Like, that's not a standard is different. You're asking us to put one on one side of the line and one on the other. I mean, what is the substantive difference between you can't build a new building that does X and you can't put it in a bedroom? What — I mean, why is one on one side of the line and one on the other? I think it's because you look to the practical effect. The practical effect of the blanket ban for new buildings, except for the couple of types that are carved out, is a ban on covered appliances. If you did — if you did exactly the same statute — Why? Because people could put them in old — you know, in non-new buildings, right? People could still buy them. They wouldn't — they wouldn't disappear from the market. There would still be a market interest in being able to purchase them, just not in the newest of the buildings in one particular state, right? So new buildings on their own — and I think engine manufacturers is helpful on this. The Supreme Court said that it didn't matter that the South Coast Air Quality Management District hadn't gone after all of the vehicles that it could. It was just a subset of the vehicles. Well, right, but I'm wondering if you're inviting just, like, a tremendous amount of fact-fighting by telling us that the standard that you recommended is a significant impact. Like, do we now need to have a district court judge make an estimation to be like, how many fewer appliances are now going to be on the market because the ban affects new buildings versus what the — I mean, and then for us to have to decide some level of significance? I think the cases use significant impact at a more conceptual level, not, like, just literally how many are affected, but it's comparing what the statute does to Congress's policy objectives and looking at how that interacts. And I think here we're right in the heartland of preemption because Congress didn't want conflicting standards, and it did want to preserve, you know, different standards and preserve the availability of appliances that use different types of fuel. But why — they're not banning the making of fossil fuel appliances, right? That would be a harder case, right? They are saying in certain buildings, you do not get a permit to build that building if you are going to use these kinds of appliances, right? Right. But if you can't install them and use them, then you can't buy them and the manufacturers can't sell them. I think one way to look at the scope of which buildings it applies to is, could the city do the same thing for setting a requirement for just this subset of buildings that the energy efficiency of any appliance has to be 10 percent greater than the federal standard? I think the answer to that is clearly no, and the same thing here because they're effectively setting a maximum energy use standard instead. Okay. Thank you.  We'll hear from you again. May it please the Court, Dustin Brockner on behalf of the Secretary of State. This Court should affirm for either of two reasons. First, the District Court's analysis of EPCA was exactly right. And second, plaintiffs have brought a facial challenge but have failed to carry their heavy burden to show New York's fossil fuel prohibition is preempted in every application. Okay. I'm going to ask the same question I asked your colleague. Would you dispute that a state regulation setting an energy use standard at an unattainable limit would be preempted? Yes, Your Honor. Okay. Why is this different? For several reasons. Well, first, the premise of their argument is wrong, which is just because two laws have the same effect, it necessarily follows in every circumstance that they concern the same subject matter. That is not true. But second, I... That's very pithy, but can you explain it? Like, yes, that's a great sound bite, but can you actually tell me what that means? It means, beyond that, that they're just relying on a, we have drawn, these things have the same effect, and that ends the analysis, and it's solely based on that. But what the analysis actually is, that EPCA requires, is you look to how the law operates. What is it regulating based upon? And the impossible performance standard, a .001, for example, it just confirms the focused nature of the preemption analysis. You look to, you know, is a law drawing a distinction based on how much energy a product is designed to consume? You don't look to effects, you don't do a messy empirical analysis of, is this a lot or a little? You just look to that conceptual question, is a law drawing a distinction, the prohibition drawing a distinction between products that use more energy or less energy? And that's the inquiry. And so for an impossible performance standard, once you have .001, you're saying you could use the product if it uses less energy, if it complies with that standard. By contrast, we are not doing that here. We are unconcerned with a product's energy performance. New York's law regulates based solely on fuel type, that source of energy, regardless of how much or how little any product consumes when operated. And we, and New York is doing this for reasons entirely unrelated to improving energy efficiency. It's banning burning of fossil fuels on site to reduce greenhouse gas emissions and improve indoor air quality. So the means are different, the ends are different, it is a, it does not fall within EPCA's preemptive scope. EPCA's structure and history confirm this, I think the structure reflects a fundamental symmetry. Federal government sets performance standards on one hand, and then states are preempted from adopting a competing performance-based criteria. And the history confirms that that was the focus, that by the mid-1980s there was a patchwork of state efficiency standards, and then Congress stepped in to require federal standards, and then also prevent a future patchwork by making it harder for DOE to waive preemption for state standards. What about the, what about their argument that Congress did express concern about some products being able to remain on the market? I mean, do you think that that's a misread of the waiver provision? Do you think that that is a tertiary or a further down, do you, I mean, what do you say about that? I'd say that is not the test for figuring out whether something's preempted in the first place. I think it reflects that Congress knows how to talk about appliance availability and energy switching or things like that, but they don't put that in the preemption provision. That is not this Court's job to assess appliance availability and engage in that kind of empirical assessment. Rather, that is several levels down, where after there's been preemption, after the state has shown, you know, has sought a waiver and shown that it is, has a law designed to improve energy performance, then the question is, as Your Honor was alluding to earlier, okay, so the state has a law, it's preempted because it concerns energy performance and will save energy, but that's not the only thing that the statute cares about in the sense that it allows DOE to make this additional assessment based on the record before it, provided by the, you know, the evidence that interested persons bring to DOE to make that assessment. But that's not the test for whether or not it's preempted in the first place, and Congress could have made up a test, but instead they put it far down and Congress doesn't bury elephants and mouse holes by putting a broad consumer right to have access to whatever appliance you want in an exception to one of the preemption exceptions. I'd like to talk about the facial challenge briefly, if I can. They brought a facial challenge, but they, but that fails because they, because they failed to show that the law cannot be constitutionally applied against anyone in any situation. Okay. Would you really have us affirm on that? I mean, couldn't they just amend their pleadings? We would have you affirm on that, and Your Honor, that's the distinction between facial and as applied. A plaintiff who brings a facial challenge can always say, well, tomorrow I'll bring an as applied challenge, but that's never been part of the analysis, and I think it's important to realize how they framed this complaint and it shaped the litigation. The complaint says they are challenging, this is JA 3536, the facial validity of the gas fan. What's that talking about? That means the statute requiring the implementing regulations, and again, because the law was facially invalid, there was no discovery on what products were being installed, what products that they, if they work on covered products or not, there's just, they just went straight for the law is invalid in every application. And then when they move for summary judgment, you read their summary judgment papers, you know, plaintiff's facial challenge to the gas fan, and they sought relief commensurate with that. They said stop the secretary from adopting any regulations at all, even though the regulations can be validly applied. So that's the chart, the course that they've charted. This Court should hold them to it. I think it's, it fails for both reasons, and this Court could affirm on both reasons, because it is turning back to the facial challenge, undisputed, that New York's law can validly prohibit the appliances that are not covered products or that lack a federal standard. Can I ask, is there something that you think is legally significant about the difference in the Berkeley law and New York's law that might suggest us not having to squarely disagree with what the Ninth Circuit did if we were to rule in your favor? Well, I understand that the facial challenge is one way to avoid it, because we, you could just affirm on that ground. But to your point, I don't know enough about the details of the Berkeley law for their, I mean, there are lots of, there are exceptions, excuse me, there are exceptions in New York's law about manufactured homes, agricultural buildings, that it is not by any means a categorical prohibition as plaintiffs. So you're saying, wait in, wait into the argument and you would have us create a circuit split then. If this Court... A good lawyer could find difference between these two words. We have not made, well, we have the facial argument, Your Honor. That is, that is certainly one way. And the presumption against preemption is also another way. But we don't think the Court needs to get into that because we have the best reading. What do you think, how do you think the state of the world is now in our circuit given Franklin and counsel? I think it's what counsel for responsible nutrition said it means, which is first, is the law ambiguous? And then if it is, you adopt the reading that is, that favors preemption. But we don't have to rely on that for two reasons. It's not ambiguous. We have, it is not preempted under, you know, for the reasons the city and we've been saying. But also, you don't, even if it's ambiguous, we still have the better reading. So there's no need to rely on the presumption. And that's the core of the other questions we ask at GeoFerm. Thank you. Thank you. Good morning, Your Honors, Troy Levine for Intervenors, New York Geothermal Organization and Push Buffalo. I think, you know, if we zoom out a little bit from what we've been talking about, the line drawing problem is a real problem, but it's present, it's presented entirely by the appellant's view. The appellants say if something is an effective ban, then it's preempted. If it has significant impact, it's preempted. But if it is, you know, if we're talking about like there's no gas distribution to the area, so you can't use the product, it's not preempted. It's not clear to me what that line is, and I'd like to just illustrate a few ways in which that describes some of the problems here. As I see it, what they're asking this court to read EPCA as is an exception from rules of general application. What they're saying is, if New York has a fire safety regime that says you can't have dangerous products, EPCA says, well, if one of those products is an EPCA-covered appliance, you actually have to have it regardless of danger. We've talked about the kerosene heaters. Their position remains in this court that the moment the Department of Energy issues an energy efficiency regulation, which has nothing to do with fire safety, New York City and New York State lose the ability to ban that product. Because in their view, when the fire marshal says you can't have that in your building, the fire marshal has set the energy use standard at zero. Okay, but what is the textual hook? I mean, is it the canon of avoiding observed results? Why are we supposed to take into account these kinds of real-world applications? Yeah. So I don't think we even need to. I think these real-world applications only arise because they've departed so far from the text. So we think the text is very clear, right? It says, relating to energy use or energy efficiency. And as you've all been asking this morning, aren't those just values that are determined at a testing, you know, in accordance with testing procedures, aren't those values that exist and are preserved regardless of whether the appliance is ever used at all? And the answer, of course, is yes. If you go to P.C. Richards up the street and you look at a refrigerator, it has an energy use number on it right now. That energy use number will not change even if no one ever buys that refrigerator, even if it's broken, even if, you know, whatever. Like that is the number of that, of the standard that the Department of Energy set. And if we have a law tomorrow that says that refrigerator is a fire hazard in New York and New York says you can't have that refrigerator in New York buildings, the Department of Energy's energy use standard has nothing to say about that. But New York can absolutely prohibit that refrigerator from being sold within New York. So that's true for kerosene heaters, but it's true for so many other things, right? We talk about zoning and they say, oh, we're not talking about zoning. But you know, that's easy enough if you're maybe talking about like a statewide zoning law. We've been talking about consumer appliances, but there's plenty of communities, you know, in the state. You just go up to Scarsdale or Hastings-on-Hudson or Bronxville, you find a bedroom community that does not have industrial zoning. ECHA covers a ton of industrial products that we haven't talked about this morning, but they are covered appliances. They have DOE-issued energy use standards. And in Scarsdale, you cannot use them. If you want to run, you know, an industrial press running off an industrial compressor in Scarsdale, the city has prohibited it or the village, excuse me, has prohibited it. That's true in Hastings. That's true in Bronxville. They are absolutely prohibited. You can't buy them. You can't install them. Now, you can't install other industrial, you know, equipment either that is not covered. Again, I think you're veering toward, we need to be focusing on what the text is because if Congress did not create a sensible law, we are limited in terms of our ability to fix it. So, like, what about the text that you think best supports a locality or a state's ability to regulate in the way that you can, that you're saying that people have done? I guess you want us to say that this is an interpretation. Like, nobody said boo before means that this is an understandable interpretation. I mean, I need to understand what the, you need to make the textual argument because we're not in the business of making policy. Absolutely, Your Honor. I couldn't agree more. Thank you for giving me that opportunity. Energy use is what the law regulates, right? The preemption clause says no regulations concerning energy use or energy efficiency. And the only distinction I'm trying to draw is not, I think you adhere to that text. It's very clear. What that means is you can't issue a competing energy use standard. If Scarsdale doesn't want industrial equipment and it does so by saying it has to be hyper-efficient industrial equipment, it can't do that. But if Scarsdale doesn't want industrial equipment on a noise ordinance, it just says you can't have any equipment that exceeds a decibel threshold. And if there is no industrial covered appliance that can hit that decibel threshold, it doesn't mean that that's an energy use regulation, even though you can't turn on, you know, a jackhammer or an industrial press and achieve that decibel level. The same is true for the laws we're talking about here today. We're talking about combustion characteristics. We're talking about air pollution they put out. We are not talking about energy use in accordance with testing procedures, which is how many kilowatts per hour, you know, a particular appliance is using to produce a particular result. So there we just turned to Congress and Congress told us when it defined energy use, what it meant. It didn't mean can it be turned on. It didn't mean does it consume energy in your home. It didn't mean does it consume energy in the factory. It just said when you test it, what is the result that it achieves in accordance with testing procedures? And none of these laws touch on that. And I want to say, you know, as long as we're talking about techs, just one more thing, which is their interpretation actually reads the words energy efficiency out of the preemption clause. They become totally superfluous because they're the clause, as we remember, right, it says relating to energy use, energy efficiency or water use. There's no category of laws that they would recognize that are covered by energy efficiency that are not also covered by energy use. Because in their view, again, if you regulate at all the operation of an appliance, you have issued an energy use standard. You're talking about its energy use. And therefore, if you said, if New York said, you know, only hyper-efficient, that's not an energy efficiency standard. That's also an energy use standard, according to Plaintiff's view. In our view, the two provisions have separate definitions. They have the definitions that Congress accorded them. Well, that's interesting. I would have thought that you would have said one was a subset of another. No, not at all, Your Honor. They're quite different, in my view, because energy use is defined to be for things like refrigerators, right, that just operate all the time. So you look at how much energy use they have over a particular amount of time. Energy efficiency is a separate type of standard that's set for things that work in cycles. And there you see how efficient they are in achieving that result. You don't look at their energy use over time. You look at their energy use in a typical use cycle. And so Congress separated those out. It separated those out under energy conservation standards. It separated them out in the preemption clause. And again, if we ignore the definitions Congress gave us, then there's no reason to separate them out in the preemption clause, because as long as you're looking at whether it's using energy, you're done. End of story. But, you know, what I want to leave the Court with is there's no indication in the text of the statute or anywhere else that Congress ever intended such a result. And I'm not asking for an absurd results, you know, canon definition, because I don't think we need to go there. But it is worth thinking of what it would mean for district courts around the country to look at every zoning ordinance and say, does this prevent? Does it not prevent? You look at a noise ordinance, you can ban a leaf blower because it's not covered by EPCA, but you can't ban, you know, an air compressor because it is. This is just an unworkable, impossible situation. And that's already happening, by the way, on the Ninth Circuit. In the amicus brief that the District of Columbia and the 12 states filed, I think on page 23 of that brief, they talk about how it's now being brought up in products liability cases, in design defect cases. Next week, the Ninth Circuit is hearing an air pollution case in which they're arguing that you can't have air pollution rules that are too stringent because, you know, for appliances that are covered by EPCA, they should be able to pollute as much as they want. None of this, you know, is related to energy use or energy efficiency in any way. Okay, so energy use and energy efficiency is a subset of energy conservation standards. Exactly right. But they're two different terms. Exactly right. They refer to two different types of standards, and both types are preempted. And can you tell me, is this issue or the similar case percolating anywhere else? Yes, Your Honor. So at the, you know, once the Ninth Circuit issued that ruling, that was a real departure for how most practitioners understood EPCA. Since that time, you know, it's been off to the races with these similar challenges. So around the country, there are, and I'm personally involved in a couple, and I know my colleagues here are involved in many of them, challenges around the country to all sorts of laws that regulate, you know, air pollution, air quality, things like that. Because the moment they touch on an EPCA-covered appliance... So tell me, are there any at the circuit level? So none have, there's not another one at the circuit level except for the one in the Ninth, which is a follow-on, you know, this time about air pollution standards. I will say there are decisions pending right now in both the trial courts in D.C. and Maryland and in Illinois and in Colorado. So there are many other circuits. Is that why we ought to either decide this case very quickly or very slowly? Yeah. Yes, Your Honor. I think, you know, I think I actually would have to ask you to, I have to ask you to decide it quickly if you can, because there's currently a stay, right? We won below, but there's now a stay of the law going into effect. So that's my request, but obviously, you know...  Thank you. Thank you very much. Thank you. I'd like to briefly address the other cases. Part of why there's a proliferation of those cases is because Berkeley unleashed a proliferation of copycat legislation banning gas appliances or banning gas infrastructure. So it's, Berkeley did something new. The Ninth Circuit held it was preemptive. There's no, there's no judgment on that part. I'm just trying to figure out the operating environment and what the doctrinal morass we're being escalated to is. Yeah. The bulk of the cases that are pending are about laws that are very similar to these and very similar to Berkeley's. On the presumption against preemption, I think the Supreme Court has just clearly resolved this in Franklin. I get that the Supreme Court, it would have been helpful for them to say, yes, we are overruling our precedent, but this was an issue on which there was a dissent in 1992. The first time the presumption was applied to an express preemption case, that view got votes over time. And Franklin says, because there's an express preemption clause, we don't invoke any presumption against preemption. This court twice applied Franklin, as written in Bono and DCC Propane. So have, I believe, eight other circuits. Only the Third Circuit has disagreed, only in a footnote. And the footnote basically says, Franklin's a bankruptcy case, so we don't have to follow it outside the bankruptcy context. I don't think that's a fair reading of Franklin. And what about the formulation in counsel? And I noticed that this is a bit of a setup. I didn't mean to do that. But what do you think? How can we square your position with Franklin with counsel? Is there any conflict? With, sorry. It's a responsible nutrition case. Yes. So I, and I think. And I am acknowledging the awkwardness. I think that there is no, the idea that it's, it turns on whether the provision is plain, I think, just flips Franklin backward in its analysis. I think Franklin, the because in Franklin is because we have an express preemption provision, and then they go to do statutory interpretation the usual way and say that there is a plain answer here. But I think the rule now, and it's the rule applied in DCC Propane, is you do statutory interpretation the usual way and find the best interpretation. There's a second piece of it. I'm sorry. So just to be clear, you think counsel for responsible nutrition did not accurately explain the law, or do you think there's a way to square the circle? I think counsel for responsible nutrition did not accurately explain the law after Franklin and these cases. And I think also the, there's a citation to, indirectly to Bates, which is a Supreme Court case applying the old presumption. That case doesn't actually say that the party, that any plausible reading is a reason to find against presumption. What the passage in Bates, and I think it got garbled a little bit in the, in this court's case quoting it, along the way to counsel for responsible nutrition, I forget the name of the Second Circuit case that was cited there. But the passage in Bates was saying the party claiming preemption didn't even have a plausible reading. So that was a case where the statute happened to be plain, and the court just went on to talk about the presumption that it has since gotten rid of. It was, I think what Bates is saying, it was that the presumption used to be used to break ties between equally plausible interpretations, not in the style of like constitutional avoidance where it's, if we could find any plausible interpretation, that one stands. And that makes sense because constitutional avoidance, there's some background constitutional problem with what Congress might have done. Here, Congress is fully entitled to exercise its authority to preempt. It did so expressly, and so the way to figure out Congress's intent is to read the statute it wrote and apply the text of that statute. If there are no further questions, I'd ask this Court to reverse in both cases. Thank you.   This was very helpfully argued. We appreciate your assistance to the Court. We will take the Court under advisement.